MATTHEW R. MCCARLEY (TX SBN: 24041426)
mccarley@fnlawfirm.com
**FEARS NACHAWATI, PLLC**
5473 Blair Road
Dallas, Texas 75231
Telephone: (214) 890-0711
Facsimile: (214) 890-0712

GALE D. PEARSON, Esq. (MN BAR NO.: 244673)
gpearson@fnlawfirm.com
**FEARS NACHAWATI, PLLC**
5473 Blair Road
Dallas, Texas 75231
Telephone: (214) 890-0711
Facsimile: (214) 890-0712
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: Juul Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation | MDL No. 2913 |
| | Case No.: 3:19-cv-08273 |
| JENNIFER WILLIAMS, Plaintiff, | |
| vs. | **COMPLAINT** |
| JUUL LABS, INC., PAX LABS, INC., ALTRIA GROUP, INC., and PHILIP MORRIS USA, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff, Jennifer Williams, by and through her undersigned counsel, brings this complaint against Defendants JUUL Labs, Inc., PAX Labs, Inc., Altria Group, Inc., and Philip Morris USA,

1
PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

Inc., and alleges as follows:

## I.   **INTRODUCTION**

1.     JUUL sells e-cigarettes and nicotine pods specifically designed both to provide a powerful hit of nicotine and to addict users. For the reasons set forth below, Plaintiff brings this complaint for damages, injunctive relief, and any other available legal or equitable relief to remedy the harms to Plaintiff resulting from JUUL's false, fraudulent, misleading, and negligent marketing and sales practices for its highly addictive JUUL products.

2.     Since 2015, JUUL has manufactured, marketed, and sold the JUUL e-cigarette and accompanying JUULpod nicotine cartridges. JUUL has marketed and sold JUULpods, all of which contain JUUL's proprietary, highly addictive nicotine e-liquid formula.

3.     Since entering the market, JUUL's sleek and easily concealable e-cigarette and its aggressive social media marketing campaign have propelled JUUL to a dominant position in the e- cigarette market. JUUL now controls more than three-quarters of the United States e-cigarette market. JUUL's marketing did not just take over a large slice of the e-cigarette market, it also drove significant market expansion. Industry analysts have credited JUUL as singlehandedly reviving the e-cigarette market, whose sales had been stagnating for years.

4.     JUUL's explosive growth, was entirely by design. JUUL's founders met and began forming their vision for JUUL while pursuing master's degrees in product design at Stanford. The founders set out to design a product that would "take tobacco back to being a luxury good and not so much a drug delivery device." To do so, JUUL designed an extra sleek, futuristic-looking and concealable e-cigarette and developed a mechanism to provide the highest dose of nicotine of any e-cigarette without the throat irritation that high levels of nicotine typically cause.

5.     To market its nicotine products, JUUL's founders turned to the tried and true tobacco industry playbook: JUUL significantly underplayed the dangers of its product, even

2

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

though it was one of the most potent e-cigarette products available when it launched. Packed inside each JUUL pod, which measures a mere 29.5 x 15 x 7 mm (about the size of a thumbnail), is a potent .7 milliliters of e-liquid that contains at least 5% nicotine by weight, or more than 6% nicotine by volume. The small JUUL pod delivers as much nicotine as two full packs of traditional combustible cigarettes. Coupled with JUUL's e-cigarette technology, JUUL's nicotine e- liquid is also more dangerous and addictive than other e- cigarettes on the market: JUUL delivers nicotine up to 2.7 times faster than other e-cigarettes, and its e-liquid nicotine levels were as much as 20 times more potent than other e-cigarette products on the market in 2017. Moreover, JUUL specially designed its e-cigarette device and e- liquid formula to minimize the harshness of nicotine on the throat, allowing even new, non- smoker users to inhale large doses of nicotine without the immediate discomfort that such high doses of nicotine would generally cause.

6.      JUUL said nothing about any of the myriad problems likely to occur from the use of its products when it launched its products. These dangers include long-term nicotine addiction; increased risk of heart disease and stroke; changes in brain functionality that lead to increased susceptibility to anxiety, depression and other addictions; decreased functionality of the endocrine system; and heightened risk of cancer.

7.      In 2018, after the FDA opened an investigation into JUUL's youth-targeted marketing, JUUL removed from its website and much of the internet the targeted images that were designed to appeal to youth and now suggests that JUUL exists solely for the benefit of adult smokers looking for an alternative. Although JUUL markets its product as a smoking cessation device ("Switch to JUUL"), it has not received FDA approval as modified risk tobacco product or as a nicotine replacement therapy, and the JUUL e-cigarette has not participated in any FDA approval process. JUUL's e- cigarettes are still as addictive, if not more so than regular cigarettes.  JUUL e- cigarettes and pods can be ordered with a subscription service on JUUL's

3
PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

website and all the while JUUL continues to hide the truth about the actual nicotine content and addictiveness of its devices. Plaintiff brings this suit to shine a light on JUUL's deceptive marketing and social media practices and stunningly addictive product, seek damages for those already harmed by it, and enjoin JUUL from continuing to endanger people like her.

8.      At the time Plaintiff used JUUL, none of JUUL's advertising, marketing, promotion, packaging or website disclosed any of the health effects and risks that JUUL knew or should have known would occur from use of its products. These risks include severe nicotine addiction, significant increases in blood pressure, vascular damage, increased risk of stroke, heart attacks and other cardiovascular injuries, permanent brain changes, mood disorders, heightened risk of cancer, and other harms. JUUL never disclosed that its products were unsafe for anyone. Instead, the imaging, advertising, promotion, packaging and overall marketing represented the product as safe, fun, and not harmful. As one of the JUUL founders has said: "We don't think a lot about addiction here because we're not trying to design a cessation product at all...anything about health is not on our mind". JUUL's design, manufacturing, marketing and distribution of this product has proven this statement to be true.

9.      Since 2015 when JUUL hit the market, JUUL has become pervasive in schools across the country and adolescent use is rampant. JUUL not only dominates the multi-billion dollar e-cigarette market, it has expanded the size of that market significantly—mostly via young non-smokers. The tobacco company Defendant Altria (formerly known as Philip Morris, also a Defendant) acquired a 35% stake in JUUL for $12.8 billion, giving Defendant Altria access to the new generation of customers JUUL has groomed.

10.     JUUL has created an epidemic. According to Alex Azar, the Secretary of the U.S. Department of Health and Human Services, "We have never seen use of any substance by America's young people rise as rapidly as e-cigarette use is rising." JUUL's conduct has led to a surge in teen e-cigarette use, creating the "largest ever recorded [increase in substance abuse] in

4
PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

the past 43 years for any adolescent substance use outcome in the U.S." In a mere two years, Defendant undid more than a decade of progress in reducing teen smoking, thereby increasing nicotine use among teenagers to levels not seen since the early 2000s. Plaintiff was both a target and a victim of JUUL's conduct.

11.    As a result of Defendant's conduct, Plaintiff has suffered life-altering personal injuries and seeks all appropriate remedies and relief.

## II.    JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 based on diversity of citizenship of the parties and the amount in controversy exceeding $75,000.

14.    This Court has personal jurisdiction over Defendants based on the fact that Defendants have their principal place of business within the state of California and that Defendants market and distribute JUUL e-cigarettes throughout the state.

15.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. §1391(b)(2) in that a substantial part of the events giving rise to the claim occurred in this district. Additionally, venue is proper pursuant to Transfer Order, Doc. 1, docket number 3:19-md-02913-WHO, from the Judicial Panel on Multi-District Litigation establishing the Northern District of California as the Court overseeing multi-district litigation on all claims involving JUUL e-cigarettes.

## III.    PARTIES

### A.  Plaintiffs

16.    Plaintiff Jennifer Williams ("Williams") resides in Spartanburg, South Carolina, and resided there throughout the relevant period for the events described below.

17.    Prior to using a JUUL for the first time in 2019, Williams smoked cigarettes on a daily basis.

18.    Williams began using JUUL because it was advertised as a safe and healthy alternative to smoking. Williams did not know that JUUL contains nicotine, delivering nicotine to

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

the bloodstream at least as efficiently as cigarettes, and presents the same or a greater risk of addiction than smoking cigarettes.

19.     Williams still struggles with this nicotine addiction and will continue to struggle with this addiction for the rest of her life. Williams's nicotine addiction from JUUL permanently injured and altered her brain. In addition to her severe nicotine addiction and brain injury, Williams has suffered harm through exposure to significant toxic substances, which may cause or contribute to causing disease and future health problems.

20.     Defendants' conduct has harmed Jennifer Williams physically, emotionally, and financially.

**B. Defendants**

21.     Defendant JUUL Labs, Inc. ("JUUL") is a Delaware corporation, having its principal place of business in San Francisco, California. JUUL originally operated under the name PAX Labs, Inc. In 2017, it was renamed JUUL Labs, Inc. JUUL manufactures, designs, sells, markets, promotes and distributes JUUL e-cigarettes. JUUL ratified each and every act or omission alleged herein in proximately causing the injuries and damages alleged herein.

22.     Defendant PAX Labs, Inc. ("PAX"), is a Delaware Corporation, having its principal place of business in San Francisco, California. JUUL Labs, Inc. was originally a part of PAX, but was spun out as a separate company in 2017. A substantial portion of the conduct cited here occurred while JUUL was part of PAX.

23.     Defendant Altria Group, Inc. ("Altria"), is incorporated in Virginia and has its principal place of business in Richmond, Virginia. Altria has partnered with JUUL Labs, Inc.

24.     Defendant Philip Morris USA, Inc. (Philip Morris), is a wholly-owned subsidiary of Altria. Philip Morris is also a Virginia corporation that has its principal place of business in Richmond, Virginia. Philip Morris is engaged in the manufacture and sale of e-cigarettes in the United States. Philip Morris is the largest cigarette company in the United States. Marlboro, the

principal cigarette brand of Philip Morris, has been the largest selling cigarette brand in the United States for over 40 years.

25.     Altria and Philip Morris are referred to collectively as the Altria Defendants. In 2018, Altria acquired 35% ownership in JUUL for $12.8 billion and access to Altria's industry infrastructure.

## IV.     FACTUAL ALLEGATIONS

**A.     JUUL Sought to Re-create the "Magic" of the Cigarette, the "Most Successful Consumer Product of All Time", using the Cigarette Industry's Playbook.**

26.     JUUL's founder James Monsees has described the cigarette as "the most successful consumer product of all time…an amazing product." Because of "some problems" inherent in the cigarette, JUUL's founders set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category."

27.     Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products." With a focus on recreating the "ritual and elegance that smoking once exemplified," Monsees and Adam Bowen set out to "meet the needs of people who want to enjoy tobacco but don't self-identify with — or don't necessarily want to be associated with — cigarettes."

28.     JUUL used the cigarette industry's prior practices as a playbook. Monsees has publicly admitted that JUUL built its e-cigarette business by first consulting cigarette industry documents, including board meeting minutes, made public under the Master Settlement Agreement that had been reached between the cigarette industry, governmental officials, and injured smokers. "[Industry documents] became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."

29.     JUUL researched how cigarette companies had chemically manipulated nicotine content to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry." Among the documents JUUL would have found were those documenting how to manipulate nicotine pH to maximize the delivery of nicotine in a youth-friendly vapor that delivers minimal "throat hit"—a combination that creates unprecedented risks of nicotine abuse and addiction, as detailed further below.

30.     JUUL also engaged former cigarette industry researchers to consult on the design of their product. JUUL's founder James Monsees noted in Wired magazine that "people who understood the science and were listed on previous patents from tobacco companies aren't at those companies anymore. If you go to Altria's R&D facility, it's empty." The Wired article stated that "some of those people are now on Pax's team of advisers, helping develop Juul."

31.     JUUL also used cigarette industry advertisements—which were created to lure nonsmoking youth—as a blueprint for JUUL's advertising campaigns. In a 2018 interview, "Monsees indicated that the design of JUUL's advertising had been informed by traditional tobacco advertisements and that [the Stanford Research into Impact of Tobacco Advertising] had been quite useful to them."

32.     JUUL achieved its vision. Since its launch in 2015, JUUL has become the dominant e-cigarette manufacturer in the United States. Its revenues grew by 700% in 2017. According to a recent Wells-Fargo report, JUUL owns three-quarters of the e-cigarette market.

**B.     JUUL is a Sleek, Easy to Conceal Nicotine Delivery Device That Can Be Used Almost Anywhere.**

33.     The JUUL e-cigarette looks sleek and high-tech. JUUL looks like a USB flash drive, and it actually charges in a computer's USB drive. It is about the size and shape of a pack of chewing gum; it is small enough to fit in a closed hand. JUUL is easy to conceal from parents and teachers. The odor emitted from JUUL is a reduced aerosol without much scent – unlike the

8

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

distinct smell of conventional cigarettes.

34.    The thin, rectangular JUUL e-cigarette device consists of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor. Each JUULpod is a plastic enclosure containing 0.7 milliliters of JUUL's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUULpod, the battery in the JUUL device activates the heating element, which in turn converts the nicotine solution in the JUULpod into a vapor consisting principally of nicotine, benzoic acid, glycerin, and propylene glycol. A light embedded in the JUUL device serves as a battery level indicator and lights up in a "party mode" display of rainbow of colors when the device is waved around.

 

35.    JUUL manufactures and distributes its nicotine formulation as JUULpods, which contain JUUL's nicotine liquid. JUUL exclusively sells its pods in four-packs, in a variety of flavors, many of which have no combustible cigarette analog, including mango, "cool" cucumber, fruit medley, "cool" mint, and crème brulee. According to a recent survey of more than 1,000 12 to 17 year-olds, 6.5% admitted to using a JUUL e-cigarette. Of those, 86% of users most recently used fruit medley, mango, cool mint, or crème brulee.

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND







36.     The physical design of the JUUL device (including its circuit board) and JUULpod determines the amount of aerosolized nicotine the JUUL emits. By altering the temperature, maximum puff duration, or airflow, among other things, Defendant can finely tune the amount of nicotine vapor the JUUL delivers.

**C.     E-Cigarettes Containing Nicotine are Addictive, Increase the Risk of Health Concerns**

37.     All leading health authorities support the three major conclusions of a 1988 report by the Surgeon General of the United States regarding nicotine and tobacco:

a.     Cigarettes and other forms of tobacco are addictive;

b.     Nicotine is the drug in tobacco that causes addiction;

c.     The physiological and behavioral processes that determine tobacco addiction are similar to those that determine heroin and cocaine addiction.

38.     Nicotine fosters addiction through the brain's "reward" pathway. A stimulant and

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

a relaxant, nicotine affects the central nervous system; increases in blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin, and causes muscle relaxation. When nicotine is inhaled it enters the bloodstream through membranes in the mouth and upper respiratory tract and through the lungs. Once nicotine in the bloodstream reaches the brain, it binds to receptors, triggering a series of physiologic effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety. These effects are caused by the release of dopamine, acetylcholine, epinephrine, norepinephrine, vasopressin, serotonin, and beta endorphin. With regular nicotine use, however, these feelings diminish and the user must consume increasing amounts of nicotine to achieve the same pleasurable effects.

39.     The neurological changes caused by nicotine create addiction. Repeated exposure to nicotine causes neurons in the brain to adapt to the action of the drug and return brain function to normal. This process, called neuroadaptation, leads to the development of tolerance in which a given level of nicotine begins to have less of an effect on the user.

40.     Once a brain is addicted to nicotine, the absence of nicotine causes compulsive drug-seeking behavior, which, if not satisfied, results in withdrawal symptoms including anxiety, tension, depression, irritability, difficulty in concentrating, disorientation, increased eating, restlessness, headaches, sweating, insomnia, heart palpitations and tremors – and intense cravings for nicotine. Though smokers commonly report pleasure and reduced anger, tension, depression and stress after smoking a cigarette, many of these effects are actually due to the relief of unpleasant withdrawal symptoms that occur when a person stops smoking and deprives the brain and body of nicotine. Studies have found that most smokers do not like smoking most of the time but do so to avoid withdrawal symptoms.

41.     Nicotine causes permanent brain changes. The effects of nicotine exposure on the brain of youth and young adults include addiction, priming for use of other addictive substances, reduced impulse control, deficits in attention and cognition, and mood disorders.

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

42.     Nicotine is also associated with cardiovascular, reproductive, and immunosuppressive problems, and is also a carcinogen. Nicotine adversely affects the heart, eyes, reproductive system, lung, and kidneys. It is well-established that nicotine increases blood pressure. Exposure to nicotine from sources such as nicotine gum still produces an increased risk of Coronary Vascular Disease by producing acute myocardial ischemia, as well as an increased risk of peripheral arterial disorders. Aside from its use as a stimulant, the only other known use of nicotine is as an insecticide.

43.     Several studies have shown that e-cigarettes increase the risk of strokes and heart attacks.

44.     Research has also demonstrated that e-cigarettes significantly increase blood pressure and arterial stiffness, which increases the risk for strokes and heart attacks.

45.     Further, scientists have found that e-cigarettes also cause oxidative stress, which leads to vascular disease and damage, known risk factors for strokes.

46.     With respect to JUUL in particular, a recent study found that "the concentrations of nicotine and some flavor chemicals (e.g. ethyl maltol) are high enough to be cytotoxic in acute in vitro assays".

47.     Nicotine affects neurological development in adolescents, and exposure to nicotine during adolescence produces an increased vulnerability to nicotine addiction. Adolescent nicotine addiction causes "substantial neural remodeling" including those parts of the brain governed by dopamine or acetylcholine, which play central roles in reward functioning and cognitive function, including executive function mediated by the prefrontal cortex. A "clear-cut relationship" between adolescent smokers and diminished neural responses has been observed such that addicts exhibit diminished sensitivity to non-drug rewards (e.g., financial rewards). This relationship becomes even more severe in adolescents who smoke more than 5 cigarettes a day. In sum, "the use of extremely rewarding drugs, such as nicotine, may decrease the pleasure obtained from non-drug

12
PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

rewards." These changes occur in "early phases of smoking."

48.     Other brain changes from nicotine include increased sensitivity to other drugs and heightened impulsivity. "Brain imaging on adolescents suggest that those who begin smoking regularly at a young age have markedly reduced activity in the prefrontal cortex and perform less well on tasks related to memory and attention compared to people who don't smoke."

**D.     JUUL Designed its E-Cigarettes to Make them Easy for People to Inhale and to Deliver Substantially Higher Doses of Nicotine than Cigarettes.**

49.     According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products." The cigarette industry has long known that "nicotine is the addicting agent in cigarettes" and that "nicotine satisfaction is the dominant desire" of nicotine addicts.

50.     For this reason, cigarette companies spent decades manipulating nicotine in order to foster and maintain addiction in their customers. For example, R.J. Reynolds Tobacco Company ("RJR") developed and patented nicotine salt additives such as nicotine benzoate to increase nicotine delivery in cigarette smoke. As detailed in an RJR memorandum titled "Cigarette concept to assure RJR a larger segment of the youth market," manipulating the pH of nicotine was expected to give cigarettes an "additional nicotine 'kick'." This kick was attributed to increased nicotine absorption associated with lower pH.

51.     JUUL knowingly used the RJR research and conclusions to produce a similar nicotine kick, and thereby promoting increased use and sales of JUUL e-cigarettes. In U.S. patent No. 9,215,895 ("the '895 patent"), assigned to "Pax Labs, Inc." and listing JUUL executive Adam Bowen as an inventor, JUUL describes a process for combining benzoic acids with nicotine to produce nicotine salts, a formulation that mimics the nicotine salt additive developed by RJR decades earlier.

52.     In a 2015 interview, Ari Atkins, a JUUL research & development engineer and one

13<br>PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

of the inventors of the JUUL device said this about the role of acids: "In the tobacco plant, there are these organic acids that naturally occur. And they help stabilize the nicotine in such a way that makes it …" He pauses. "I've got to choose the words carefully here: Appropriate for inhalation."

53.      JUUL's manipulation of nicotine pH directly affects the palatability of nicotine inhalation by reducing the "throat hit" users experience when vaping. Benzoic acid reduces the pH of solutions of nicotine, an alkali with a pH of 8.0 in its unadulterated, freebase form. This reduction in pH converts naturally-occurring unprotonated nicotine, which causes irritation in the throat and respiratory tract, to protonated nicotine, which is not be absorbed in the throat or upper respiratory tract and, therefore, does not irritate the throat. A recent study found  that JUUL's e-liquid had a pH of under 6.0, suggesting that the JUUL contains almost no freebase (i.e., non-salt form) nicotine.

54.      The vapor from JUUL's e-liquid contains about the same ratio of free-base nicotine—and hence causes the same amount of irritation—as a nearly nicotine-free 3 mg/mL e- liquid.

55.      The same chart further shows that the Duell Study authors found that the low freebase fraction in its aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability."

56.      The authors noted that "tobacco company documents suggest that products [like JUUL] with high nicotine levels but a low [percentage of freebase nicotine] will yield vape aerosols of much reduced harshness as compared to products with even only moderate nicotine levels" but high percentages of freebase nicotine.

57.      JUUL's creation of a product with low levels of harshness and minimal throat "hit" is consistent with the goal of producing a product for young non-smokers. The non-irritating vapor product is easier for non-smokers to consume without negative side effects like

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

coughing or irritation. The design also shows that JUUL's intention was to recruit nonsmokers, not existing smoker, because smokers are already tolerant of the throat hit and have even been habituated into associating the "throat hit" with getting their nicotine fix. Minimizing the throat "hit" of JUUL e-cigarettes is therefore unnecessary to providing an alternative for adult smokers, but is crucial to luring a new generation of users.

58.    The Duell study concluded that JUUL's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth."

59.    JUUL's lack of throat hit increases the risk of using the product, because it masks the amount of nicotine being delivered, by eliminating the throat sensory feedback normally associated with a large dose of nicotine. The "throat hit" is part of the body's alert system, letting a person know he is inhaling something harmful. Eventually, the irritation to the throat will cause even the most compulsive addict to wait before the next inhalation. Reducing or removing this feedback impairs the user's ability to ascertain that he is consuming a toxin. As a result, the cravings for nicotine can be satisfied nonstop, fostering addiction or aggravating an existing addiction, and repeatedly exposing the user to the health risks associated with the product, such as significantly increased blood pressure.

60.    JUUL sells products that contain relatively low amounts of throat-irritating freebase nicotine, yet contain and deliver far higher concentrations of nicotine than cigarettes or other electronic nicotine delivery systems ("ENDS") containing freebase nicotine.

61.    Blood plasma studies in the '895 patent show that vaping nicotine benzoate increases nicotine delivery compared to cigarettes or vaporized solutions of freebase nicotine. In fact, nicotine uptake was up to four times higher for nicotine salt formulations than traditional cigarettes (approximately 4 ng/mL/min compared to approximately 1 ng/mL/min). JUUL's data also indicates that nicotine salt solutions produce a higher heart rate in a shorter amount of time (a

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

50 beats/minute increase within 2 minutes for nicotine salt, versus a 40 beats/minute increase in 2.5 minutes for a Pall Mall cigarette). Nicotine salts also cause a faster and more significant rise in heart rate than placebo or vaporized freebase nicotine.

62.     The following figure from the '895 patent shows that a 4% solution of benzoic acid and nicotine salt, which is the formula used in JUULpods, causes a peak nicotine-blood concentration ("Cmax") of approximately of approximately 15 ng/mL, compared to a Cmax of 11 ng/mL for a Pall Mall cigarette. (To make the figure more readable, JUUL's 4% nicotine benzoate data is highlighted in red, and the Pall Mall data is highlighted in blue.)



63.     JUUL's '895 patent shows that a 4% solution of benzoic acid nicotine salt causes a peak nicotine-blood concentration ("Cmax") of approximately 15 ng/mL, compared to a Cmax of 11 ng/mL for a Pall Mall cigarette.

64.     As high as the reported nicotine dose reported for JUULpods is, the actual dose is likely higher. Though the strongest benzoic acid concentration mentioned in the '895 patent is 4% (i.e., 40 mg/mL of benzoic acid), one study tested four flavors of JUULpods and found a 4.5% benzoic acid ($44.8 \pm 0.6$) solution. That study found that JUULpods contained a concentration of

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

6.2% nicotine salt (about 60 mg/mL), rather than the 5% nicotine (about 50 mg/mL) advertised. JUULpods containing an absolute nicotine concentration 1.2% higher than the stated 5% on the label (a relative increase of over 20%) coupled with more benzoic acid than listed in the '895 patent produce higher nicotine absorption than expected for the advertised formulation.

65.    Other studies have reported even higher actual concentrations of nicotine in JUULpods. Some experts estimate that JUULpods contain the same nicotine as two packs of cigarettes.

66.    In any event, JUUL is delivering doses of nicotine that are materially higher than delivered by combustible cigarettes. As a paper published by the European Union citing the United Kingdom Medicines and Healthcare Products Regulatory Agency notes, "an e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in 5 minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine)." With at least 59 mg/mL of nicotine delivered in a salt form that increases the rate and efficiency of uptake (and even with a lower mg/mL amount), a JUULpod will easily exceed the nicotine dose of a traditional cigarette. Not surprisingly, the European Union has banned all e-cigarette products with a nicotine concentration of more than 20 mg/ml nicotine, and Israel is seeking to do the same. As Israel's Deputy Health Minister has noted, "a product that contains a concentration of nicotine that is almost three times the level permitted in the European Union constitutes a danger to public health and justifies immediate and authoritative steps to prevent it from entering the Israeli market."

67.    Comparison of available data regarding per puff nicotine intake corroborates the other JUUL studies (mentioned above), indicating that JUUL delivers about 30% more nicotine per puff. Specifically, a recent study of JUULpods found that "[t]he nicotine levels delivered by the JUUL are similar to or even higher than those delivered by cigarettes." The Reilly study tested JUUL's Tobacco, Crème Brulee, Fruit Punch, and Mint flavors and found that a puff of JUUL

17
PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

delivered $164 \pm 41$ micrograms of nicotine per puff. By comparison, a 2014 study using larger 100 mL puffs found that a Marlboro cigarette delivered 152—193 μg/puff. Correcting to account for the different puff sizes between the Reilly and Schroeder studies, this suggests that, at 75ml/puff, a Marlboro would deliver between 114 and 144 μg/puff. In other words, empirical data suggests that JUUL delivers up to 36% more nicotine per puff than a Marlboro.

68.     Because "nicotine yield is strongly correlated with tobacco consumption," a JUULpod with more nicotine will strongly correlate with higher rates of consumption of JUULpods, generating more revenue for JUUL. For example, a historic cigarette industry study looking at smoker employees found that "the number of cigarettes the employees smoked per day was directly correlated to the nicotine levels." In other words, the more nicotine in the cigarettes, the more cigarettes a person smoked.

69.     Despite the above data, Defendant has failed to disclose to consumers that the JUULpods' nicotine salt formulation delivers an exceptionally potent dose of nicotine.

70.     By delivering such potent doses of nicotine, JUUL products magnify the health risks posed by nicotine, significantly increase blood pressure, and place users at heightened risk for stroke, heart attacks and other cardiovascular events.

71.     Further, because JUUL's nicotine salts actually increase the rate and magnitude of blood plasma nicotine compared to traditional cigarettes, the risk of nicotine addiction and abuse is higher for JUUL e-cigarettes than traditional cigarettes. Thus, JUULpods are foreseeably exceptionally addictive when used by persons without prior exposure to nicotine—a fact not disclosed by Defendant.

72.     At the same time, as discussed above, the throat "hit" from nicotine salts is much lower than that for combustible tobacco products, making it easier to inhale. According to researchers, the "high total nicotine level (addictive delivery)" of a JUUL coupled with its easily inhalable nicotine vapor is "likely to be particularly problematic for public health."

18
PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

73.     This powerful combination—highly addictive and easy to inhale—also repeatedly exposes users to the toxic chemicals in the vapor, compounding the health risks to users, as described above.

74.     In addition to its nicotine content, the "Cool" Mint pods pose additional risks. The FDA's Tobacco Products Scientific Advisory Committee in March 2011 issued a report on menthol cigarettes, concluding that the minty additive was not just a flavoring agent but had drug-like effects, including "cooling and anesthetic effects that reduce the harshness of cigarette smoke." Mint could also "facilitate deeper and more prolonged inhalation," resulting in "greater smoke intake per cigarette."

75.     JUUL has fraudulently concealed material information about the addictive and dangerous nature of its e-cigarettes. Defendant necessarily is in possession of all of this information.

**E.     JUUL Conspired with Others in the Cigarette Industry to Engage Third- Party Spokespersons to Downplay the Risks of E-cigarettes, Create Doubt, and Misrepresent the Benefits of Nicotine.**

76.     Because JUUL understood that it could not specifically make health-related claims without drawing the ire of the FDA, JUUL conspired with others in the cigarette industry to engage consultants, academics, reporters, and other friendly sources such as the American Enterprise Institute, to serve as spokespersons and cheerleaders for e-cigarette products. Taking yet another page from the cigarette-industry playbook, these influencers masked their connection to the e-cigarette industry, while serving as its mouthpiece to cast doubt about risks and overstate benefits.

77.     For example, just as JUUL launched, cigarette company expert witness Sally Satel published an article in Forbes Magazine touting the benefits of nicotine—claiming it aids in concentration—and stating that it is harmless. In another article, she lauded efforts by JUUL and others to develop nicotine-related products, and cast any doubters as hysterical and creating a "panic".

78.     Numerous other articles, videos, and podcasts—also spread through social media—echoed this same message that the public health community was overreacting to e- cigarettes and in a panic about nothing.

79.     During each of its multiple fundraising rounds, JUUL assured potential investors that "addiction to something that is not harmful", suggesting that JUUL was no more harmful than coffee.

80.     On information and belief, JUUL and its co-conspirators spread this message through hired third-party spokespersons and influencers.

81.     Furthering their campaign of doubt and confusion, when asked directly about health risks, JUUL's employees and founders would point reporters to other sources to indicate that its products had been shown to be safe, or not harmful, rather than admit what it knew were the dangers.

82.     JUUL well-understood from the cigarette industry playbook that sowing doubt and confusion over the benefits and risks of e-cigarettes is key to long-term success. First, by creating a "two-sides-to-every-story" narrative, JUUL reduced the barriers for young people and new users to try the product, and gave addicted users permission to keep using the product and avoid the pain of withdrawal. Second, by engaging people who looked like independent experts, JUUL staved off regulation and suppressed political opposition, allowing it a long runway to capture market share. Third, by belittling the public health community, JUUL neutered its most vocal threat.

83.     On information and belief, JUUL conspired with others in the cigarette industry to fraudulently conceal the risks of e-cigarettes, recognizing that a campaign of doubt, misinformation and confusion would benefit all of them and would be the key to the industry's survival.

**F.     JUUL Intentionally Misrepresents and Grossly Understates the Amount of Nicotine in each JUULpod.**

84.     From JUUL's pre-release announcements to this day, that provided marketing services to JUUL, has continuously falsely represented that each pod contains only as much nicotine as a pack of cigarettes. JUUL repeats these claims widely in advertisements, press releases, on its packaging, and on its web site. For example, some JUUL advertisements and JUUL's website currently provides that each "JUULpod is designed to contain approximately 0.7mL with 5% nicotine by weight at time of manufacture which is approximately equivalent to 1 pack of cigarettes or 200 puffs." This statement is false and seriously misleading because, as JUUL knows, it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines the product's narcotic effect, risk of addiction, and other health risks.

85.     Defendant knows that benzoic acid affects pH and "absorption of nicotine across biological membranes."

86.     Assuming a concentration of 59 mg/mL, JUUL's reported nicotine content corresponds to about 40 mg of nicotine per 0.7 mL JUULpod. If, as JUUL claims, this is equivalent to one pack of cigarette (or 20 cigarettes), that implies 2 mg of nicotine per cigarette.

87.     JUUL's equivalency claim further assumes 10 puffs per cigarette (i.e., 200 puff per pack), or 0.2 mg (200 μg) of nicotine per puff.

88.     Typically, a cigarette that delivers around one milligram of nicotine in smoke retains "about 14-20 milligrams of nicotine in the unsmoked rod," *USA v. Philip Morris*, p. 567, for an overall delivery of 5-7% of the cigarette's actual nicotine content. A study by the Center for Disease Control found that in "commercial cigarette brands, nicotine concentrations ranged from 16.2 to 26.3 mg nicotine/g tobacco (mean 19.2 mg/g; median 19.4 mg/g)." Assuming an average of 19 milligrams of nicotine per cigarette, an average pack of cigarettes contains 380 milligrams of nicotine, or six times as much nicotine as the 62 milligrams reported for each JUULpod. Yet the average pack would be expected to deliver only 5-7% (19-27 mg) of its nicotine

content to the user. In line with this expectation, a study of thousands of smokers found smokers intaking between 1.07 to 1.39 milligrams per cigarette (21.4-27.8 mg per pack). This is less than half of the amount of nicotine contained in a JUULpod (i.e., 2 mg per "cigarette" based on JUUL's stated concentration, or 200 μg per puff assuming 100% delivery). Even with the slightly lower efficiency of delivery demonstrated in studies like Reilly (about 82%, for averages of 164 μg per puff), this amounts to a substantially higher amount of nicotine that a human will absorb from a JUULpod than from smoking a pack of cigarettes.

89.     JUUL's statement in its advertisements that each JUULpod contains about as much nicotine as a pack of cigarettes is therefore literally false and likely to mislead, because the amount of nicotine contained in the JUULpod is perhaps six times less than in a pack of cigarettes, but the actual amount of nicotine consumed via JUULpod is as much as twice as high as that via cigarettes. This fact is never mentioned by JUUL.

90.     Further, while a pack of cigarettes contains 20 cigarettes which each have to be separately lit, the JUUL can be inhaled continuously, and often can be used indoors without detection by others, a feature that JUUL promoted heavily in its advertisements, eliminating the need for smoking breaks. Thus, the device design leads users to intake far more nicotine than would occur with cigarettes.

91.     Finally, the JUUL device does not have a manual or automatic "off" switch. On information and belief, neither the JUULpod nor the programming of the JUUL device's temperature or puff duration settings limit the amount of nicotine JUUL delivers each puff to the upper bound of a cigarette. Thus, in contrast to a traditional cigarette, which self-extinguishes as each cigarette is consumed, the JUUL allows non-stop nicotine consumption, which is limited only by the device's battery. As a result, the JUUL is able to facilitate consumption of extraordinarily high levels of nicotine that a cigarette cannot match. This makes it easier for the user to become addicted to nicotine and poses additional health risks.

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

92.     Contrary to Defendant's representations, the above data indicate that each JUULpod delivers significantly more nicotine than a pack of cigarettes, both per pack and per puff. JUUL's products thus have the foreseeable effect of luring youth, who react positively to a strong nicotine "kick," and exacerbating nicotine addiction and adverse health effects associated with nicotine consumption.

93.     Thus, JUUL is more harmful when compared to cigarettes, in that the extraordinarily high levels of nicotine can cause heightened blood pressure and stroke, and the repetitive exposure to the toxins and chemical in JUUL can also cause vascular damage and stroke.

**G.      Defendants Never Warned Jennifer Williams that JUUL's Products Were Unsafe, Addictive, and Dangerous.**

94.     At no time before Williams became severely addicted, did JUUL provide any warnings about the risks of addiction, stroke, or other brain damage.

95.     At no time before Williams became severely addicted did JUUL or any other Defendants warn Jennifer Williams that JUUL products were unsafe for her, nor instruct her on how much JUUL would be safe to consume.

96.     Despite making numerous revisions to its packaging since 2015, JUUL did not add nicotine warnings until forced to do so in August of 2018, far too late for Plaintiff. The original JUUL product labels had a California Proposition 65 warning indicating that the product contains a substance known to cause cancer, and a warning to keep JUULpods away from children and pets, but contained no warnings specifically about the known effects, or possible long-term effects, of nicotine or vaping/inhaling nicotine salts. Many of JUUL's advertisements, particularly before November 2017, also lacked a nicotine warning.

97.     Furthermore, JUUL misrepresents the nicotine content of JUULpods by representing it as 5% strength. As discussed above, JUULpods contain more than 5% nicotine by volume, and deliver it in a form that is particularly potent.

98.     Instead, JUUL marketed its JUUL products as an "alternative to  cigarettes," thereby giving the false impression that they are not harmful like traditional cigarettes and safe to use.

99.     Plaintiff did not and could have known the risks associated with JUUL, because Defendant had exclusive knowledge about its product, including its design, and concealed that information from her.

100.    Instead, as a result of JUUL's wildly successful marketing campaign, based on tactics developed by the cigarette industry and amplified in social media, Williams reasonably believed that JUUL was safe, harmless, fun, and cool—a thing to do with friends.

101.    A 2017 study by the Truth Initiative Schroeder Institute® found that 6 percent of youth and 10 percent of young adults have used a JUUL e-cigarette in the last 30 days. The study also found that while many young people are aware of JUUL, many are unaware that the product always contains the addictive chemical nicotine.

    a.  Twenty-five percent of survey respondents aged 15 to 24 recognized a JUUL e-cigarette device when shown a photo of the product.

    b.  Among those who recognized JUUL, 25 percent reported that use of this product is called "JUULing," indicating that this product is so distinctive, it is perceived as its own category.

    c.  Sixty-three percent of JUUL users did not know that this product always contains nicotine.

**H.  JUUL's Conduct Harmed Jennifer Williams**

244.    Jennifer Williams began using JUUL e-cigarettes when she was exposed to advertising and promotions for JUUL via social media and other, more traditional media outlets. These ads, promotions, and other sources made JUUL e-cigarettes seem like a harmless and safer alternative to smoking cigarettes.

245.    Plaintiff first tried JUUL e-cigarettes in 2019.

246.    Plaintiff started using JUUL e-cigarettes as a healthier, safer alternative to smoking traditional cigarettes.

247.    Plaintiff was not aware of how much nicotine JUUL contained or that it carried any health risks.

248.    Plaintiff relied to her detriment on JUUL's representations that the product was safe, not harmful, and fun.

249.    JUUL never warned Plaintiff that JUUL was addictive, dangerous, could cause her to suffer a cardiovascular injuries, or would permanently alter her brain.

250.    Had Plaintiff known that JUUL was overly addictive, carried health risks, and would cause the problems it has in her health and personal life, she never would have tried it.

251.    JUUL never disclosed that it had manipulated the nicotine in JUUL to deliver massive doses of nicotine that could addict her almost immediately, an addiction that she will now fight for the rest of her life.

252.    JUUL never instructed Plaintiff that the product was unsafe for her, nor how much JUUL was safe to consume.

253.    Had Plaintiff known that JUUL was not safe, was addictive, dangerous, could cause cardiovascular issues, could permanently alter her brain and impair her mood and mind, that JUUL had manipulated nicotine to maximize addiction, or that each JUULpod delivered substantially more nicotine than a pack of cigarettes, she would not have used or continued to use JUUL.

254.    As a direct and proximate result of JUUL's conduct, Plaintiff suffered severe injuries, including but not limited to nicotine addiction, seizures, and other breathing issues. Plaintiff's nicotine addiction puts her at serious risk for life-long health problems including, but not limited to, increased risk of heart disease and stroke, changes in brain functionality that lead

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

to increased susceptibility to anxiety, depression and other addictions, decreased functionality of the endocrine system, heightened risk of cancer, and negative effects on fertility. Health risks aside, Williams also faces a lifetime of economic losses needed to sustain a nicotine addiction for the remainder of her life.

255.    As a result of her injuries caused by JUUL, Plaintiff has incurred and will incur significant medical and other expenses to sustain and/or fight her nicotine addiction for the rest of her life, pain and suffering, and emotional distress.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Products Liability—Defective Design

257.    Plaintiff incorporates the above and below allegations by reference.

258.    At all relevant times, JUUL Labs designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled and/or sold the JUUL Devices and Pods ("JUUL Products") that Plaintiff consumed and which were intended by Defendants to be used as a method of ingesting nicotine and the other aerosolized constituents of JUUL's nicotine solution.

259.    JUUL Products were defective in design in that they did not perform as safely as an ordinary consumer would have expected them to perform when used in an intended or reasonably foreseeable way.

260.    Defendants had constructive notice or knowledge and knew, or in the exercise of reasonable care should have known, that its JUUL Products under ordinary use were harmful or injurious, particularly to nonsmokers, youths and adolescents, including the Plaintiff. Defendants

26
PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

knew or, should have known the risks inherent in minors ingesting nicotine, particularly severe lifelong nicotine addiction and decreased brain development. These are serious injuries in that they affect not only the short-term quality, but the remainder of the young person's life.

261.    The JUUL Defendants claim they designed JUUL for use by adult smokers. However, Defendants designed and marketed their products to appeal to nonsmokers, youths and adolescents and to encourage them to buy and use the product. Defendants defectively designed JUUL in a number of ways.

262.    JUUL products are inherently defective because they contain and deliver significantly more nicotine than JUUL represents and significantly more nicotine than traditional cigarettes. Moreover, JUUL is unreasonably dangerous and therefore defective in design because it is made to create and sustain addiction. JUUL designed the product to contain more nicotine than necessary to satisfy a cigarette smoker's nicotine craving with the intention of creating addiction. JUUL's nicotine salts enhance the risk and severity of addiction; it supplies nicotine at high levels without any of the intake harshness associated with other nicotine products. Furthermore, JUUL is defectively designed in that it uses flavors that appeal to minors and enhances minors' ability to intake dangerous amounts of nicotine. The risks inherent in the design of JUUL outweigh significantly any benefits of such design.

263.    In addition, JUUL products are inherently defective in that it is created to be easy to hide, a design that is enticing to minors. Lifelong smokers are accustomed to the open, notorious and inconvenient act of smoking cigarettes – the smell and taste of cigarettes as well as the need to step outside and smoke. These are traditional properties of smoking a cigarette that smokers actually often appreciate and enjoy. A smoke break has been valued for year by smokers. A device that is easy to hide, tastes good, and does not smell is not necessary to draw in lifelong smokers as customers, but it is entirely necessary to draw in first time smokers and minors. The physical appearance of JUUL makes it easy for minors to hide it at school or at home by concealing it in their

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

clothing, backpacks, markers, or even their hand, or by passing it off as a USB or another device, a feature that would not be necessary or appealing to a lifelong smoker. However, the design is most certainly convenient to a minor. It also is designed in such a way as to look completely harmless. Resembling a USB drive that tastes good in this technology driven age, the JUUL device is duly attractive to nonsmokers of every age.

264.    The benefits of JUUL products' design are not outweighed by their risks, considering the gravity of the potential harm resulting from the use of the products, the likelihood that harm would occur, the feasibility and cost of an alternative safer design at the time of manufacture, and the disadvantages of an alternative design.

265.    At all times relevant, Defendants could have employed reasonably feasible alternative designs to prevent the harms discussed in the complaint. Defendants could have created the product to not specifically appeal to minors and could have created the product to appeal more to current adult smokers. Defendants also could have significantly lowered the nicotine content while still satisfying an adult smoker's nicotine cravings, maintaining the same need JUUL products so claim to meet. Defendants could have designed this product to not contain flavors that appeal to minors and make it easier to intake dangerous levels of nicotine.

266.    At all times relevant, Plaintiff was unaware of the design defects described in the Complaint. Further, Defendants knew or had reason to know that youths and adolescents would not fully realize the dangerous and addictive nature of the JUUL products and the long-term complications nicotine addiction can present, or that, due to their youth, inexperience and/or immaturity of judgment, would recklessly disregard such risks.

267.    As a result of JUUL's conduct, Plaintiff was harmed directly and proximately by Defendants' defectively designed JUUL e-cigarette as described herein. Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; severe nicotine addiction, a permanent injury that Williams will now struggle with for the rest of her life;

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

Williams' exposure to such a high content of nicotine has also affected her brain, an injury that cannot be undone; and economic harm in that she would not have purchased JUUL or would have paid less for it if she had known the true facts and that she has paid a premium as a result of Defendants' defective products.

## SECOND CAUSE OF ACTION
### Products Liability—Manufacturing Defect

268.   Plaintiff incorporates the above and below allegations by reference.

269.   According to JUUL's labels, JUULpods are supposed to contain 60 mg/mL of nicotine.

270.   According to JUUL's '895 patent, JUULpods are intended to contain 4% benzoic acid by weight.

271.   The JUULpods manufactured by Defendants contained more than 60 mg/mL nicotine.

272.   The JUULpods manufactured by Defendants contained more than 4% benzoic acid.

273.   As a result of these manufacturing defects, the already extreme risk of addiction posed by JUUL e-cigarettes was heightened to an extent that increased the already extreme addiction risks the JUUL e-cigarettes posed.

## THIRD CAUSE OF ACTION
### Products Liability—Product Defect as the Result of Inadequate Warning

274.   Plaintiff incorporates the above and below allegations by reference.

275.   At all times relevant, Defendants manufactured, marketed, distributed, and/or sold the JUUL Products that Plaintiff consumed.

276.   At all times relevant, Defendants were well-aware that JUUL is a dangerous product

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

that contains highly addictive levels of nicotine and subjects users to severe nicotine addiction and other serious medical conditions, as described in this Complaint. Further, the JUUL products that plaintiff consumed had other potential risks that were known or were knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community well before and at the time of manufacture, market, distribution, and sale. Despite having that knowledge, Defendants failed to adequately warn the minor Plaintiff of the dangerous, addictive nature of JUUL as well as the multitude of health risks it posed.

277.    The potential risks presented a substantial danger when the JUUL Products were used or misused in an intended or reasonably foreseeable way.

278.    At all times relevant, Plaintiff would not have recognized the risks of using a JUUL device with a JUUL pod because Defendant JUUL has intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction. Since the Altria Defendants partnered with JUUL, they too have since intentionally downplayed, misrepresented, concealed and failed to warn of the heightened risks of nicotine exposure and addiction.

279.    Further, the ordinary consumer of JUUL Products would not have recognized the potential for risks for the same reasons.

280.    JUUL Products were defective and unreasonably dangerous when they left Defendants' possession because they did not contain adequate warnings, including warnings that the products are not safe for anyone under 26 years old, may cause strokes, heart attacks and other cardiovascular injuries, are powerfully addictive, may cause permanent brain changes and mood disorders, may impair learning and cognition. Additionally, the products lacked sufficient instructions, including that the product should not be used concurrently with cigarettes, and instructions regarding how many pods are safe to consume in a day.

281.    Instead, as described herein, Defendants marketed their products to young people

30

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

and made them available in youth-friendly colors and flavors. Defendants also designed their products to be more palatable to youth and nonsmokers by increasing JUUL's inhale-ability, incorporating appealing flavors, and increasing the level of nicotine that is absorbed by users, making them even more addictive and dangerous.

282.    Defendants had constructive notice or knowledge and knew, or in the exercise of reasonable care should have known, that its Products were dangerous, had risks, and were defective without adequate warnings or instructions, including because delivering high doses of nicotine to a young person could cause severe addiction to nicotine, permanently alter the structure of the  brain and resulting in irreversible, life-altering injuries.

283.    In all forms of advertising as well as social media communications, Defendants failed to adequately warn or instruct foreseeable users, including youth and adolescent users, that JUUL products were unreasonably dangerous to them and created a high level of risk of harms caused by nicotine exposure and addiction as explained herein. Defendants failed to adequately warn in their advertising, social media communications, or anywhere on the product label that the product was not for sale for minors and should not be used or consumed by them. Instead, as described herein, Defendants marketed their products to minors and made them available in youth-friendly colors and flavors. Defendants also designed their products to be more palatable to youth and nonsmokers by increasing JUUL's inhale-ability and increased the level of nicotine that is absorbed by users, making them even more  addictive.

284.    The defects in JUUL Products, including the lack of warnings, existed at the time the JUUL pods and devices were sold and/or when the JUUL pods and devices left JUUL's possession or control.

285.    As a result of Defendants' failures to adequately warn and/or instruct, Plaintiff was harmed directly and proximately as described herein. Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; severe nicotine addiction, a

permanent injury that Williams will now struggle with for the rest of her life; Williams' exposure to such a high content of nicotine has also affected her brain, an injury that cannot be undone; and economic harm in that she would not have purchased JUUL or would have paid less for it if she has known the true facts and that she had paid a premium as a result of Defendants' failure to warn.

286.    The inadequate warning was a substantial factor in Williams becoming addicted to nicotine and being at risk for the severe health problems discussed herein.

287.    Based on Defendants' misconduct, Williams demands compensatory and punitive damages as set forth below.

### FORTH CAUSE OF ACTION
### Negligent and/or Grossly Negligent
### Design and Marketing

288.    Plaintiff incorporates the above and below allegations by reference.

289.    Defendants had a duty and owed a duty to Plaintiff to exercise a degree of reasonable care including, but not limited to: ensuring that JUUL marketing does not target minor; ensuring that JUUL devices and JUULpods are not sold and/or distributed to minors and are not designed in a manner that makes them unduly attractive; designing a product that is not defective and unreasonably dangerous; designing a product that will not addict youth or other users to nicotine; adequately warning of any reasonably foreseeable adverse events with respect to using the product. Defendants designed, produced, manufactured, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those consumed it, such as Plaintiff.

290.    Defendants breached that duty they owed to Plaintiffs by, among other things as alleged above, misrepresenting the pharmacokinetics of JUUL e-cigarettes, the nicotine content of JUUL pods, the comparative nicotine content of JUUL pods and competing products, and the role of benzoic acid in JUUL pods

32
PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

291.    Defendants unreasonably failed to provide appropriate and adequate warnings and instructions about its products, and this failure was a proximate cause of the harm for which damages are sought.

292.    Defendants were negligent in designing, manufacturing, supplying, distributing, inspecting, testing (or not testing), marketing, promoting, advertising, packaging, and/or labeling JUUL's Products.

293.    As a powerfully addictive and dangerous nicotine-delivery device, Defendants knew or should have known that JUUL Products needed to be researched, tested, designed, advertised, marketed, promoted, produced, packaged, labeled, manufactured, inspected, sold, supplied and distributed properly, without defects and with due care to avoid needlessly causing harm. Defendants knew or should have known that its JUUL Products could cause serious risk of harm, particularly to persons like Plaintiff.

294.    In addition, at the time the JUUL products left its control, Defendants knew, or in the exercise of reasonable care should have known, the products posed a substantial risk of harm to the life and health of its customers.

295.    Defendants were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

296.    The negligence and extreme carelessness of Defendants includes, but is not limited to, the following:

a. Failure to perform adequate testing of the JUUL Products prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, and other related medical conditions;

b. Failure to take reasonable care in the design of JUUL's Products;

c. Failure to use reasonable care in the production of JUUL's Products;

d. Failure to use reasonable care in the manufacture of JUUL's Products;

e. Failure to use reasonable care in the assembly of JUUL's Products;

33

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

f.  Failure to use reasonable care in supplying JUUL's Products;

g.  Failure to use reasonable care in distributing JUUL's Products;

h.  Failure to use reasonable care in advertising, promoting, and marketing JUUL's Products;

i.  Use of design that maximizes nicotine delivery while minimizing "harshness", thereby easily creating and sustaining addiction;

j.  Failure to develop tools or support to help people addicted to JUUL cease using the product, including manufacturing lesser amounts of nicotine;

k.  Failure to reasonably and properly test and properly analyze the testing of JUUL's Products under reasonably foreseeable circumstances;

l.  Failure to warn its customers about the dangers associated with use of JUUL's Products, in that it significantly increases blood pressure, carries risks of stroke, heart attacks, and cardiovascular events, is powerfully addictive, can cause permanent brain changes, mood disorders, and impairment of thinking and cognition.

m. Failure to warn customers that JUUL had not adequately tested or researched JUUL Products prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, and other related medical conditions;

n.  Failure to utilize proper materials and components in the design of JUUL's Products to ensure they would not deliver unsafe doses of nicotine;

o.  Failure to use due care under the circumstances;

p.  Failure to take necessary steps to modify JUUL's Products to avoid delivering high doses of nicotine to young people and repeatedly exposing them to toxic chemicals;

q.  Failure to recall JUUL's Products; and

r.  Failure to inspect JUUL's Products for them to operate properly and avoid delivering unsafe levels of nicotine.

297.    Defendants breached the duties they owed to Plaintiff and in doing so, were wholly unreasonable. A responsible company, whose primary purpose is to help adult smoker, would not design a product to appeal to minors and nonsmokers nor market their products to minors and

nonsmokers. If they are aware of the dangers of smoking and nicotine ingestion enough to create a device to help people stop smoking, then they are aware of the dangers enough to know that it would be harmful for young people and nonsmokers to use.

298.    But for Defendants' duties and breaches thereof, Plaintiff would not have been harmed as alleged in the Complaint.

299.    Defendants' negligence and/or gross negligence directly and proximately caused Plaintiff's damages and injuries, and therefore Plaintiff is entitled to damages and other legal and equitable relief as a result.

## FIFTH CAUSE OF ACTION
### Fraud

309.    Plaintiff incorporates by reference paragraphs above as if fully set forth herein.

310.    At all times relevant, Defendants fraudulently and deceptively sold or partnered to sell products to Plaintiff as non-addictive nicotine delivery systems, or less addictive nicotine products than cigarettes, when Defendant knew it to be untrue.

311.    Defendants had a duty to disclose material facts about JUUL to Plaintiff, as:

a.    Defendants disclosed some facts to Plaintiff about the nature and safety of its products but intentionally failed to disclose other facts, making the disclosures it did make misleading or deceptive; and

b.    Defendants intentionally failed to disclose certain facts about the nature and safety of JUUL products that were known only to Defendants and that Defendants knew Plaintiff could not have known or reasonably discovered.

312.    At all times relevant, Defendants fraudulently and deceptively sold or partnered to sell JUUL products to Plaintiff as safe or not harmful, when Defendants knew it to be untrue.

313.    Defendants fraudulently and deceptively downplayed or minimized any risk associated with e-cigarettes generally and JUUL. At all relevant times, Defendant JUUL represented its products on its website as a "smarter" choice. Defendant JUUL pitched investors by

35
PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

claiming that the product was not harmful, and therefore any concern about addiction was irrelevant. Defendants and/or others worked together to pitch news stories or other media content designed to downplay the risks of e- cigarettes, suggesting that any concern was overblown, or a panic.  These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers buying JUUL products, and to avoid regulation or legislative   efforts to control sales.

314.     Defendants fraudulently and deceptively failed to disclose to Plaintiff that the JUUL creates an insatiable nicotine addiction, significantly increases blood pressure, can cause mood disorders, induce seizures and other adverse health effects.

315.     Defendants fraudulently and deceptively failed to disclose that they had not adequately researched or tested JUUL to assess its safety before placing it on the market.

316.     Defendants also fraudulently and deceptively failed to disclose to Plaintiff that the JUUL nicotine salts purchased were highly addictive in nature, making it extremely difficult for one to cease purchasing JUULpod refills.

317.     Defendants further failed to disclose to Plaintiff that JUUL is designed to create and sustain an addiction to nicotine. Defendants also manipulated the formulations of JUUL devices and JUULpods in ways that could and would impact their potency and addictiveness, and Defendants did so without notifying Plaintiff. Defendants actively concealed the nicotine content and nicotine potency of JUUL e-cigarettes.

318.     Defendants fraudulently misrepresented to users the amount of nicotine consumed by using JUUL. As previously explained, Defendant JUUL claims that one JUULPod is "approximately equivalent to about 1 pack of cigarettes," but that is false and misleading. The amount of nicotine consumed from one JUULPod is actually equivalent to the amount of nicotine consumed through at least two packs of traditional cigarettes.

319.     Each of these misrepresentations and omissions were material at the time they were

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

made. In particular, each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to purchase or consume a JUUL E-cigarette and/or JUULpods.

320.    Plaintiff did not know of the facts that Defendants concealed.

321.    Defendants intended to deceive Plaintiff and the public by concealing these facts. Defendants had a duty to accurately provide this information to Plaintiff.  In not so informing Plaintiff, Defendants breached their duty. Defendants also gained financially from, and as a result of their breach.

322.    Defendants had ample opportunities to disclose these facts to Plaintiff, through packaging, advertising, retail outlets, and on social media. Defendants concealed material information at all relevant times to this Complaint. Defendants have yet to disclose the truth about JUUL products.

323.    Plaintiff relied to her detriment on Defendants' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from her regarding the safety of JUUL, and not intentionally deceived by Defendants, she would not have purchased or used JUUL products.

324.    Plaintiff was harmed directly and proximately by Defendants' fraud. Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; severe nicotine addiction, a permanent injury that Williams will now struggle with for the rest of her life; Williams' exposure to such a high content of nicotine has also affected her brain, an injury that cannot be undone; and economic harm in that she would not have purchased JUUL or would have paid less for it if she had known the true facts and that she had paid a high premium as a result of Defendants' fraud.

325.    Defendants' acts and omissions as described herein were committed maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights,

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

interests, and well-being to enrich Defendants. Defendants' conduct was designed to maximize Defendants' profits even though Defendant knew that it would cause loss and harm to Plaintiff.

## SIXTH CAUSE OF ACTION
## Conspiracy to Commit Fraud

326.   Plaintiff incorporates by reference paragraphs above as if fully set forth herein

327.   During all relevant times, including before Plaintiff consumed JUUL, Defendant JUUL was part of a conspiracy with tobacco and e-cigarette industry players, Altria Group, PAX Labs, Inc. to fraudulently conceal, misrepresent, and downplay the risks of e-cigarettes to boost profits at the expense of public health. Defendants, for research and development, marketing, and distribution purposes, engaged consultants, pundits, academics, lobbyists, media personalities, reporters, researchers and other influencers to tout the safety of e- cigarettes, and benefits of nicotine, while minimizing or downplaying the dangers, playing on the vulnerabilities of people. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers buying JUUL products, and to avoid regulation or legislative efforts to control sales.

328.   JUUL was aware that others in the e-cigarette and tobacco industry, Defendant Altria Group, and PAX planned to engage in a campaign of doubt to mislead, downplay, and deflect concerns about the risks of e-cigarettes and nicotine, and to fraudulently conceal material information about the safety of these products and compounds.

329.   JUUL agreed with others in the e-cigarette and tobacco industry, Defendants Altria Group and PAX and intended that the conspiracy to commit fraudulent concealment be committed.

330.   Defendants well-understood and continues to understand that by working in concert with other e-cigarette manufacturers and the tobacco industry, it can more effectively mislead and fraudulently conceal material facts from the public, including Plaintiff, regarding risks of its

products, as described herein.

331.   Defendants' participation in this conspiracy was a substantial factor in causing Plaintiff's harm as alleged herein.

332.   Defendants' acts and omissions as described herein were committed maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights, interests, and well-being to enrich Defendants. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### SEVENTH CAUSE OF ACTION
### <u>Intentional Misrepresentation</u>

333.   Plaintiff incorporates by reference paragraphs above as if fully set forth herein.

334.   At all times relevant, Defendants represented to Plaintiff via the media, advertising, website, social media, packaging, and promotions that:

    a.    JUUL products were safe or not harmful; and

    b.    That one JUULPod is "approximately equivalent to about 1 pack of cigarettes

335.   These representations were false. JUUL products are unsafe and the amount of nicotine consumed from one JUULPod is actually equivalent to the amount of nicotine consumed through at least two packs of traditional cigarettes.

336.   Defendants knew these representations were false, or made them recklessly without regard for their truth. For example, JUUL claims that it did not study the safety of its products, acknowledging that it had a vested interest, and instead left it to others to analyze their risks.

337.   Defendants intended for Plaintiff to rely on these representations.

338.   Each of these misrepresentations were material at the time they were made. In particular, each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to purchase or consume JUUL ENDS or Pods.

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

339.    Defendants have yet to disclose correct these misrepresentations about JUUL products.

340.    Plaintiff reasonably relied on these representations and was harmed as described herein. Plaintiff's reliance on Defendants' representation was a substantial factor in causing her harms, including becoming powerfully addicted to JUUL. Had Defendants told Plaintiff the truth about the safety and composition of JUUL's products, she would not have purchased them.

341.    Defendants' intentional misrepresentation was a substantial factor in Plaintiff's harm as described herein, including that she became severely addicted to the nicotine and incurred permanent brain changes, resulting in irreversible, life-altering injuries. She also suffered economic harm in that she would not have purchased JUUL or would have paid less for it if she had known the true facts and that she has paid a high premium as a result of Defendants' fraud.

342.    Defendants' acts and omissions as described herein were committed maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights, interests, and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## EIGHTH CAUSE OF ACTION
### Unjust Enrichment

343.    Plaintiff incorporates by reference paragraphs above as if fully set forth herein.

344.    As described in this Complaint, Defendants knowingly sold or partnered to sell JUUL products to Plaintiff in a manner that was unfair, unreasonable, unconscionable, and oppressive.

345.    As a result of Defendants' intentional, unlawful, and deceptive actions described above, Defendants were enriched at the expense of Plaintiff.

346.    Under the circumstances, it would be against equity and good conscience to permit

Defendants to retain the ill-gotten benefits received from Plaintiff. Thus, it would be unjust and inequitable for Defendants to retain the benefit without restitution to Plaintiff for the monies paid to Defendants for its defective JUUL products.

## II.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

347.    Award Plaintiff compensatory, restitutionary, rescissory, general, consequential, punitive and exemplary damages in an amount to be determined at trial, and also including, but not limited to:

      a.  General Damages;

      b.  Special Damages, including all expenses, including incidental past and future expenses, including medical expenses, and loss of earnings and earning capacity;

348.    Award prejudgment interest as permitted by law;

349.    Enter an appropriate injunction against Defendants and their officers, agents, successors, employees, representatives, and assigns;

350.    Appoint a monitor and retain jurisdiction to ensure that Defendants comply with the injunctive provisions of any decree of this Court;

351.    Enter other appropriate equitable relief;

332.    Award reasonable attorneys' fees and costs, as provided for by law; and

333.    Grant such other and further relief as the Court deems just and proper.

## III.    JURY TRIAL DEMAND

334.    Plaintiffs demand trial by jury.


Dated: December 19, 2019

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

1

2       */s/ Matthew R. McCarley*
        MATTHEW R. MCCARLEY (TX SBN:
3       24041426)
        mccarley@fnlawfirm.com
4       **FEARS NACHAWATI, PLLC**
        5473 Blair Road
5       Dallas, Texas 75231
        Telephone: (214) 890-0711
6       Facsimile: (214) 890-0712

7       */s/ Gale D. Pearson*
        GALE D. PEARSON, Esq.  MN NO.:
8       244673
        gpearson@fnlawfirm.com
9       **FEARS NACHAWATI, PLLC**
        5473 Blair Road
10      Dallas, Texas 75231
        Telephone: (214) 890-0711
11      Facsimile: (214) 890-0712
        *Attorneys for Plaintiff*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                              42
27      PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

28